## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| |
|---|
| **SUSAN WONG,** |
|         **Plaintiff,** |
| **v.** |
| **CLARA MAASS MEDICAL CENTER, RWJBARNABAS HEALTH, JOHN DOES 1-10 and XYZ Corporations 1-10,** |
|         **Defendants.** |

Civ. No. 20-05510 (KM) (AME)

**OPINION**

**KEVIN MCNULTY, U.S.D.J.:**

Plaintiff Susan Wong was employed as a registered nurse at Clara Maass Medical Center ("CMMC") until she was terminated in April 2018. Two months prior to her termination, in February 2018, Wong suffered an injury at work that she claims left her with a number of persistent and disabling symptoms. After multiple evaluations by two different CMMC doctors and a neurologist authorized by CMMC to treat her, Wong was cleared to return to work without restrictions. Nevertheless, Wong did not report to any of her scheduled shifts between March 17 and April 25, 2018 and was subsequently terminated.

Wong sued CMMC and its affiliate, RWJ Barnabas Health, for violations of the New Jersey Law Against Discrimination, the New Jersey Workers' Compensation Statute, the Family Medical Leave Act, and New Jersey common law. Now before the Court is the defendants' motion for summary judgment. (DE 47.)[1] For the reasons set forth below, the motion for summary judgment is **GRANTED**.

---

[1]    Certain citations to the record are abbreviated as follows:

## I.   Background

I recite the material facts, many of which are undisputed, reserving certain topics for later discussion. Defendant CMMC is an acute care hospital in Belleville, New Jersey. (Def. St. ¶1; Pl. Resp. ¶1.) CMMC is part of a network of health care providers that all operate under the umbrella of defendant RWJ Barnabas Health ("RWJBH"). (DE 47-4 at 2; Pl. St. ¶156; Def. Resp. ¶156.)

Between 1994 and 1996, Wong worked as a certified nurse assistant at CMMC and at St. Barnabas Medical Center. (Wong Dep. 54:4-24.) St. Barnabas Medical Center merged with Robert Wood Johnson Health System in 2016 to create RWJBH. (DE 54-3 at 11.)

Between 1996 and 2003, Wong was employed at West Hudson Hospital in Kearny, New Jersey. (Wong Dep. 54:20-55:5, 59:6-8.) In 2003, Wong

---

DE = Docket entry in this matter

Mot. = Defendants' brief in support of motion for summary judgment (DE 47-3)

Opp. = Plaintiff's brief in opposition to motion for summary judgment (DE 54)

Reply = Defendants' reply brief in further support of motion for summary judgment (DE 61)

Def. St. = Defendants' statement of undisputed facts (DE 47-2)

Pl. Resp. = Plaintiff's response to defendants' statement of undisputed facts (DE 54-1 at 1)

Pl. St. = Plaintiff's statement of undisputed facts (DE 54-1 at 9)

Def. Resp. = Defendant's response to plaintiff's statement of undisputed facts (DE 61-1)

Wong Cert. = Certification of plaintiff in opposition to defendants' summary judgment motion(DE 55-5)

Wong Dep. = Excerpts from transcript of deposition of Susan Wong conducted on May 12, July 8, July 9, July 13, July 20, and July 27, 2021 (DE 54-5)

Zuza Dep. = Excerpts from transcript of deposition of Sally Zuza (DE 54-8 at 67)

Vukic Dep. = Excerpts from transcript of Dr. Mario Vukic (DE 47-56)

Weisberg Dep. = Excerpts from transcript of deposition of Dr. Ira Weisberg (DE 54-8 at 62)

returned to CMMC to work as a registered nurse ("RN"). (*Id.* 59:6-60:2.) Beginning in 2005, Wong was assigned to work three 12-hour night shifts per week. (Def. St. ¶12; Pl. Resp. ¶12.)

### A. Wong's injury and treatment by Corporate Care

On her way to work on February 18, 2018, Wong entered the CMMC building and collided with the revolving glass entry door. (Def. St. ¶40; Pl. Resp. ¶40.) She worked her full night shift despite the injury, and the following morning she filled out an incident report regarding the accident. (Def. St. ¶¶41-42; Pl. Resp. ¶¶41-42.) She also went to Corporate Care, which provides treatment for work-related injuries to CMMC employees. (Def. St. ¶¶43-44; Pl. Resp. ¶¶43-44.)

In addition to providing treatment, Corporate Care makes fitness-for-duty determinations for CMMC employees. (Def. St. ¶46; Pl. Resp. ¶46.) When appropriate, Corporate Care refers employees to specialists for additional treatment and/or evaluation. (Def. St. ¶45; Pl. Resp. ¶45.) Human Resources ("HR") is guided by the fitness-for-duty determinations made by Corporate Care in consultation with any referring specialists. (Def. St. ¶48; Pl. Resp. ¶48.)

Wong was initially evaluated by Dr. Corina Smighelschi at Corporate Care on February 19, 2018. (Def. St. ¶53; Pl. Resp. ¶53; Pl. St. ¶23; Def. Resp. ¶23.) As part of this initial evaluation, Dr. Smighelschi conducted a physical exam and ordered a CT scan of Wong's head and brain without contrast. (Def. St. ¶49; Pl. Resp. ¶49.) The scan revealed "[n]o evidence of intracranial pathology" or fracture. (Def. St. ¶¶50-51; Pl. Resp. ¶¶50-51.) Based on the physical exam and CT scan, Dr. Smighelschi concluded that there was no acute pathology that would keep Wong from returning to work. (Def. St. ¶52; Pl. Resp. ¶52.) Dr. Smighelschi diagnosed Wong with a "head contusion" and instructed her to take "Tylenol as needed." (Pl. St. ¶25; Def. Resp. ¶25.) Corporate Care thus released Wong to return to work full duty without restriction. (Def. St. ¶53; Pl. Resp. ¶53.)

Following her initial visit at Corporate Care, Wong utilized unscheduled paid time off ("PTO") to cover her shifts on February 21, 23, and 26, 2018. (Def.

St. ¶55; Pl. Resp. ¶55.) On February 26, 2018, she returned to Corporate Care for a follow-up visit. (Def. St. ¶56; Pl. Resp. ¶56.) During the follow-up, Dr. Smighelschi ordered an X-Ray and a CT of Wong's cervical spine. Both the X-Ray and CT were performed that day. (Def. St. ¶¶57-58; Pl. Resp. ¶¶57-58.) The CT revealed that Wong had a "disc bulge" in three of her vertebrae. (Pl. St. ¶32; Def. Resp. ¶32.) After evaluation, Dr. Smighelschi diagnosed Wong with a head contusion and placed her on modified duty, restricting her to sedentary work. (Def. St. ¶59; Pl. Resp. ¶59.) Wong was also referred to a specialist for further neurological evaluation. (Def. St. ¶60; Pl. Resp. ¶60.) She was instructed to return to Corporate Care following this evaluation. (Def. St. ¶61; Pl. Resp. ¶61.)

On February 27, 2018, Wong presented a health certificate from her personal physician stating that she was "restricted to home and could not work / attend school" from February 27 to March 2, 2018 due to a personal health problem. (Def. St. ¶¶63-64; Pl. Resp. ¶¶63-64.) Wong thereafter utilized unscheduled PTO on February 28, 2018, and took an unpaid day off on March 1, 2018. (Def. St. ¶66; Pl. Resp. ¶66.) On March 2, 2018, Wong returned to work in a sedentary-duty capacity. Because she missed an annual competency training that was scheduled for March 1, she attended the training on March 2 instead. (Def. St. ¶69; Pl. Resp. ¶¶67, 69.) According to Wong, the training required her to stand for four hours and thus did not allow her to work in a sedentary-duty capacity only. (Pl. Resp. ¶69.)

Instead of her regular night shifts, Wong was assigned to work the day shifts on March 6 and March 8, 2018, again in what was supposed to be a modified capacity. (Def. St. ¶72; Pl. Resp. ¶72.) According to Wong, her employers did not adhere to a light duty schedule, as she was asked to make rounds, required to stand on her feet for extended periods of time, and asked to make a long trip to the basement of the hospital to pick up medication from the pharmacy. (Pl. Resp. ¶72.) Wong testified that she had to "drink two cups of black coffee to stay awake" and that she is ordinarily "not a coffee drinker." (Wong Dep. 421:14-15.)

4

On March 9, 2018, in accordance with her Corporate Care referral, Wong was evaluated by board-certified neurologist Dr. John E. Robinton. (Def. St. ¶¶74-76; Pl. Resp. ¶¶74-76.) In his report, Dr. Robinton stated that while he believed that Wong sustained a concussion and cervical strain as a result of her February 18, 2018, injury, "[s]ymptomatology is disproportionate to the nature of the injury and multiple complaints were unaccompanied by findings on today's examination." (DE 47-30 at 3.) He continued:

> Given the fact that she remains somewhat symptomatic, I believe it's best for her recovery, if she stays out of work for a week. At the end of the week, she'd be able to return to work full duties without restriction. She requires no neurologic follow up or additional evaluations despite the fact that she requested performance of both MRI of the brain and MRI of the cervical spine while here today.

(*Id.*) Dr. Robinton thus determined that Wong was "unable to return to work in any capacity until March 16, 2018," and that "[a]s of that date she will be neurologically cleared to return to work full duties without restrictions." (Def. St. ¶¶77-78; Pl. Resp. ¶¶77-78.)

As directed, Wong returned to Corporate Care on March 13, 2018. (Def. St. ¶80; Pl. Resp. ¶80.) Consistent with Dr. Robinton's recommendation, Dr. Smighelschi at Corporate Care released Wong to work full duty starting on March 16, 2018. (Def. St. ¶81; Pl. Resp. ¶81.) Dr. Smighelschi also ordered MRIs of Wong's brain and cervical spine based on Wong's request. (Def. St. ¶¶83-84; Pl. Resp. ¶¶83-84.) The resulting MRI reports indicated that the MRI of Wong's brain was "unremarkable." (Def. St. ¶85; Pl. Resp. ¶85.) As for the MRI of Wong's cervical spine, it revealed three "small central protrusion[s]" and two herniated discs. (DE 47-47 at 2.)

Wong did not report to work for her scheduled shifts on March 17 and 18, 2018. (Def. St. ¶92; Pl. Resp. ¶92.) On March 20, 2018, Wong was evaluated for a fourth time at Corporate Care by Dr. Ira Weisberg, who released her to return to work full duty without restrictions. (Def. St. ¶¶93-94; Pl. Resp. ¶¶93-94; Wong Dep. 154:14-16.) Wong annotated the Work Status Form

releasing her to full duty to indicate that she "disagree[d]." (Def. St. ¶95; Pl. Resp. ¶95.) In a letter dated March 29, 2018, CMMC's workers' compensation carrier notified Wong that no further treatment was authorized under her claim at this time. (DE 54-4 at 26.) The letter explained that MRIs were ordered at Wong's request and that Dr. Weisberg reviewed the findings and discharged her. (*Id.*)

Wong claims that during her March 20th visit at Corporate Care, she complained of dizziness, balance problems and blurred vision, but Dr. Weisberg did not accept that these symptoms were the result of a concussion caused by her accident. (Wong Dep. 146:14-147:19.) Instead, he suggested that her eyeglasses were the wrong prescription. (*Id.*) When Wong complained about her neck pain, Dr. Weisberg explained to Wong that her imaging showed age-related degeneration. (Wong Dep. 154:17-155:19.)

Wong did not report to work for her scheduled shifts on March 22, March 23, March 27, March 28, March 29, April 2, April 3, April 4, April 9, or April 11 of 2018. (DE 47-28 at 2.) On April 5, 2018, HR Director Greg Rivera directed HR Generalist Lori Onque to send Wong a letter regarding her unauthorized leave of absence. (Pl. St. ¶49; Def. Resp. ¶49.) By way of letter dated April 11, 2018, Onque advised Wong as follows:

> Our records indicate that you have been on an unapproved leave of absence since March 17, 2018. Since you have failed to return to work by the agreed date without an approved extension it has been assumed that you have separated from your position from Clara Maass Medical Center. Unless we hear from you by Wednesday, April 18, 2018, your employment will be terminated. You may, however, reapply for employment in the future.

(Def. St. ¶97; Pl. Resp. ¶97.)

 On April 12, 2018, Wong presented Onque with a note from her personal neurologist, Dr. Mario Vukic. Vukic's note, dated April 11, 2018, stated that Wong was seen in Dr. Vukic's office that day and that "she is unable to return to work until further notice." (Def. St. ¶98; Pl. Resp. ¶98.) Onque emailed Vukic's note to Alfred Torres, Chief HR Officer, on April 18, 2018. (Def. St. ¶99;

Pl. Resp. ¶99.) Torres then forwarded the note to the head of Corporate Care, who sent it to CMMC's workers' compensation insurance carrier. (Def. St. ¶¶101-02; Pl. Resp. ¶¶101-02.)

The workers' compensation carrier responded by letter dated April 19, 2018, in which it notified Dr. Vukic that he was not an authorized treating physician for Wong's work-related injury. (Def. St. ¶104; Pl. Resp. ¶104.) That letter cited the New Jersey Workers' Compensation Statute, which provides that the carrier has the right to direct medical treatment. (DE 54-8 at 34.) The letter further advised that if Wong requires further treatment she should return to Corporate Care. (Def. St. ¶105; Pl. Resp. ¶105.)

On April 24, 2018, Wong was evaluated again at Corporate Care by Dr. Weisberg, who again cleared her to return to work full duty with no restrictions. (Def. St. ¶¶106-7; Pl. Resp. ¶¶106-7.) Wong annotated the Work Status Form releasing her to work full duty to indicate that she "disagree[d] again." (DE 47-41 at 2.) According to Wong, she showed Dr. Weisberg the note from Dr. Vukic and he "flung it back" at her and told her it means nothing. (Wong Dep. 338:1-6.) Dr. Weisberg testified, however, that he did not see Dr. Vukic's note in April 2018, and that if he had he likely would have contacted Dr. Vukic to understand the basis for the doctor's differing opinion. (DE 54-8 at 64:3-14.) Wong also claims that she asked Dr. Weisberg to order additional testing during her visit, and he responded that "he's not going to order a multi-million dollar workup on" her. (Wong Dep. 337:19-25.)

After her visit to Corporate Care on April 24, 2018, Wong met with Onque and Rivera and informed them that she was not ready to return to work. (Wong Dep. 357:15-358:7; Def. St. ¶114; Pl. Resp. ¶114.) Wong testified that she complained to Onque and Rivera about her persisting symptoms and requested temporary disability leave or leave pursuant to the Family Medical Leave Act ("FMLA"). (Wong Dep. 322:5-15; 359:4-9.) She also presented the April 11, 2018, letter from Dr. Vukic. (Pl. St. ¶134; Def. Resp. ¶134.) According to Wong, Onque and Rivera told her that FMLA leave was not available to her. (Wong Dep. 323:16-22.) They further advised her that if she did not report to

work for her scheduled shift on April 25, 2018, she would be terminated. (DE 47-45.) On April 25, Wong called Onque and stated that she was "still not well enough to return." (Def. St. ¶119; Pl. Resp. ¶119.) Onque responded that Wong would be terminated effective that day and that once she feels better she can reapply for another position. (DE 47-45.)

On May 1, 2018, following Wong's termination, Wong was seen again by Dr. Robinton. (Def. St. ¶¶110-11; Pl. Resp. ¶¶110-11.) Dr. Robinton wrote in his report that:

> On examination today [Wong] scored 38/38 on a formal mental status exam. Cranial nerve testing revealed no abnormalities. On motor testing, there was normal bulk and tone. Power was 5 out of 5. Sensory exam was intact. Cerebellar testing was normal. Galt testing revealed narrow base with equal armswing. Reflexes were symmetric. Toes were downgoing.

(Def. St. ¶113; Pl. Resp. ¶113.) Dr. Robinton concluded:

> Based on today's examination and the nature of the injury, I continue to believe that from a neurologic perspective, she has reached maximum medical improvement and is able to work full duties in her usual occupation without restriction. Neurologic follow up is not required.

(Def. St. ¶112; Pl. Resp. ¶112.)

**B. Wong's continued treatment by Dr. Vukic**

As noted above, Wong was first evaluated by Dr. Vukic on April 11, 2018. (Def. St. ¶148; Pl. Resp. ¶148.) During that visit, Dr. Vukic diagnosed Wong with post-concussive syndrome and concluded that she was unable to return to work. (Def. St. ¶¶149, 151; Pl. Resp. ¶¶149, 151.) Other than "cognitive evaluation," *i.e.,* a formal memory test, Dr. Vukic did not recommend any course of treatment. (Def. St. ¶150; Pl. Resp. ¶150.)

Dr. Vukic next saw Wong on May 17, 2018, at which time he again diagnosed her with post-concussive syndrome and concluded that she was unable to work. (Def. St. ¶152; Pl. Resp. ¶152.) He testified that he based his diagnosis on her "[d]ifficulty with concentration, tasks that require attention and tasks that require multiple levels of processing simultaneously." (Vukic

Dep. 26:2-6.) He recommended again that she undergo cognitive evaluation and receive physical therapy as a result of a pinched nerve in her neck related to her concussion. (Def. St. ¶152; Pl. Resp. ¶152.)

On August 8, 2018, Wong received the recommended cognitive evaluation. (Def. St. ¶153; Pl. Resp. ¶153.) On October 19, 2018, Dr. Vukic referred Wong for cognitive rehabilitation, which included "memory exercises and skills to cope." (Def. St. ¶154; Pl. Resp. ¶154.) Dr. Vukic next evaluated Wong on January 8, 2019, at which time he again diagnosed her with post-concussive syndrome and concluded that she was still unable to return to work. (Def. St. ¶155; Pl. Resp. ¶155.) He concluded the same when he evaluated her subsequently on April 11, 2019 and a final time on August 14, 2019. (Def. St. ¶¶156-57; Pl. Resp. ¶¶156-57.)

Since she was terminated on April 25, 2018, Wong has not sought to return to work at CMMC. (Def. St. ¶123; Pl. Resp. ¶123.) She testified at her July 9, 2021, deposition that as of that date, she was still medically unable to resume employment as a nurse. (DE 49-5 at 353:21-24.)

### C. Wong's father's earlier hospitalization at CMMC and Wong's complaints of racist comments

In July 2016, Wong's father was hospitalized at CMMC in the same unit to which Wong was assigned as an RN. (Def. St. ¶¶14-15; Pl. Resp. ¶¶14-15.) Wong's mother had previously also been hospitalized at CMMC. (Def. St. ¶¶16-17; Pl. Resp. ¶¶16-17.)

At some point while her father was in the hospital, Wong approached Sam Inu, a nurse treating her father, and expressed concerns about his neurological status. (Pl. St. ¶82; Def. Resp. ¶82.) Wong also expressed concern about the fact that her father was originally placed on a ventilator in the Emergency Room and admitted to the Intensive Care Unit, but then was subsequently moved to a "regular medical floor" despite constant wheezing. (*Id.*)

According to Wong's deposition testimony, Inu asked Wong if it was acceptable, in her culture, to look directly into a person's eyes when speaking

to them. (Pl. St. ¶83; Def. Resp. ¶83.) Inu also asked Wong if her father spoke English. (*Id.*) Wong reported these comments to Ronnie Castro, Director of Cardiac Services and Primary Stroke Program, who responded that it is necessary to look into a person's eyes when conducting a neurological exam. (Pl. St. ¶38; Def. Resp. ¶38; Wong Dep. 624:1-15.) Castro agreed to take a look at Wong's father's chart when he had a chance. (*Id.*)

Wong testified that she later called Castro to see if he had looked at her father's chart, but Castro did not answer her calls or follow up. (Wong Dep. 624:15-24.) In a certification submitted in response to the defendants' summary judgment motions, Wong stated that she "made attempts to follow up with Castro about my complaints of racism, but Castro never responded nor took remedial measures." (Wong Cert. ¶23.) She also explained that when she complained to Castro about Inu's comments, Castro "repeatedly made clear to me that his main priority was not my complaints of racist remarks, but rather a hospital director who was currently in the [Medical] ICU." (Wong Cert. ¶22.)

Wong testified that she reported her concerns about Inu to Kim Byrne, Director of Critical Care, Rose Giachetti, her then-supervisor, and some of her colleagues. (Wong Dep. 616:14-18, 625:21-626:3, 627:21-25.) In her post-discovery certification, Wong stated that she also told Sally Zuza, an HR employee, about Inu's racist comments, and that Zuza said that she would notify Rivera of Wong's complaint. (Wong Cert. ¶48.)

On July 19, 2016, Wong sent a letter to CMMC Chief Executive Officer Mary Ellen Clyn and then-Chief Medical Officer Dr. Frank Mazzarella expressing concern about her parents' care at CMMC. (Def. St. ¶19; Pl. Resp. ¶19.) In response to the letter, on July 27, 2016, Dr. Mazzarella and several other CMMC employees met with Wong to discuss her concerns. (Def. St. ¶20; Pl. Resp. ¶20.) As a follow up to the meeting, then-Director of Patient Experience Sabratha Thomas sent Wong a letter stating that Wong's concerns regarding her parents' experiences were "thoroughly reviewed and investigated." (DE 47-12 at 2.) Wong's father passed away on July 27, 2016. (Def. St. ¶21; Pl. Resp. ¶21.)

Wong testified that several other hospital employees made racist remarks to her during her time working at CMMC. According to Wong, Dr. Mehul Shah approached her in October 2016 and stated that "the Chinese are taking over the world." (Wong Dep. 714:3-23.) In addition, Wong testified that Dr. Louis Petracca "regularly made comments in his medical notes on my race, and went out of his way to emphasize my racial differences." (Wong Cert. ¶25; Wong Dep. 695:1-20.) For instance, Dr. Petracca once described a printer that was malfunctioning as "slow like a slow boat to China." (*Id.*) Wong further stated that she was allowed to review her father's medical notes and that those notes included racist comments Dr. Petracca had made, as Dr. Petracca had treated her father on one occasion. (*Id.* ¶26; Wong Dep. 694:13-16.) Wong testified that Dr. Petracca wrote in her father's medical chart that her father is "a Chinese man from China, who speaks Chinese." (Wong Dep. 690:1-8.)

On December 14, 2016, Wong drafted a note addressed to Dr. Mazzarella in which she expressed concern about Dr. Shah's and Dr. Petracca's comments. (DE 47-16; Wong Dep. 718:19-23.) Wong testified that she left the note with Dr. Mazzarella's assistant, though Dr. Mazzarella testified that he does not recall receiving the note. (Def. St. ¶¶32-33; Pl. Resp. ¶¶32-33.) Wong testified that she never received a response from Dr. Mazzarella and that she never raised the issue of Dr. Shah's comment with anyone else. (Wong Dep. 720:21-721:6.)

In an October 31, 2017 email to Dr. Mazzarella, Wong reported a subsequent interaction with Dr. Petracca. (DE 54-3 at 30-31.) Wong testified that in October 2017, Dr. Petracca approached Wong and asked her if she wanted to hear a "famous Chinese proverb by a famous Chinese person." (Wong Dep. 629:2-10.) He then said, with a feigned accent, "Life is cheap, toilet paper is expensive." (*Id.* 629:20-25.) Dr. Mazzarella testified that he had "no reason to believe" that he did not receive Wong's email relaying this interaction. (Pl. St. ¶125; Def. Resp. ¶125.)

Wong testified that Dr. Shah and Dr. Weisberg made additional concerning comments to her during her time at CMMC. According to Wong, Dr.

Shah confronted her in the hallways, said that he was "border patrol," and made references to Donald Trump. (*Id.* at 724:4-10, 725:5-19.) With respect to Dr. Weisberg, Wong testified that he at one point "put his hands together like a steeple, like he's praying and then he bowed and he was hunched over, he leaned over and he was kowtowing." (Wong Dep. 807:18-21.) In addition, when Wong told Dr. Weisberg that she needed another referral, Dr. Weisberg allegedly referenced, in a mocking manner, a "Dr. Chen Cheng Chung." (*Id.* 808:17-20.)

In her certification, Wong stated that she complained about race discrimination to her supervisor, Heather Reginio, in December 2017. (Wong Cert. ¶27.) Wong also asserted that on April 24, 2018, the day before she was terminated, she spoke with Onque and detailed the racist remarks and actions of Dr. Weisberg. (Wong Cert. ¶28.) Her certification suggests that Rivera was present during this conversation. (*Id.* ¶34.)

## II.    Procedural history

Wong commenced this action in New Jersey Superior Court on April 10, 2020. (DE 1 at 2.) On May 4, 2020, the defendants removed the matter to federal court on the ground that the complaint contains federal claims and pendent state-law claims. (*Id.* at 2-3.) The parties proceeded to discovery, which concluded on January 20, 2023. (DE 39.) On February 17, 2023, the defendants filed their motion for summary judgment. (DE 47.) The motion is now fully briefed and ripe for decision.

## III.   Legal standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. Cnty. of Allegheny*

*Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998) (citing *Peters v. Delaware River Port Auth. of Pa. & N.J.*, 16 F.3d 1346, 1349 (3d Cir. 1994)).

The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing' — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist). "A fact is material if—taken as true—it would affect the outcome of the case under governing law. And a factual dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *M.S. by and through Hall v. Susquehanna Twp. Sch. Dist.*, 969 F.3d 120, 125 (3d Cir. 2020) (quotation marks and citation omitted).

## IV.   Discussion

Wong's theory is that she was terminated from her position at CMMC for discriminatory and retaliatory reasons. Specifically, Wong claims that she was terminated because of her race and disability, and also in retaliation because she complained about race discrimination, requested a reasonable accommodation, and sought workers' compensation benefits. Apart from her claims of unlawful termination, Wong alleges that the defendants violated the law by failing to accommodate her disability and interfering with her attempt to take FMLA leave. Finally, she alleges that the defendants are liable for breach of contract and breach of the implied covenant of good faith and fair dealing.

### A. Discriminatory discharge under the NJLAD

I begin with Wong's claims of discriminatory discharge under the New Jersey Law Against Discrimination ("NJLAD"). "The NJLAD, codified at N.J.S.A. 10:5–1 *et seq.*, was enacted to reflect 'the clear public policy of [New Jersey] … to abolish discrimination in the work place.'" *Broad v. Home Depot U.S.A., Inc.*, 16 F. Supp. 3d 413, 419 (D.N.J. 2014) (quoting *Shaner v. Horizon Bancorp.,* 116 N.J. 433, 436 (1989)). The NJLAD makes it unlawful for an employer to discharge any individual on the basis of race and disability, among other protected characteristics. N.J. Stat. Ann. § 10:5-12.

The critical element in an employment discrimination case is the employer's intent. *See Zive v. Stanley Roberts, Inc.*, 182 N.J. 436, 446 (2005) (citing *Marzano v. Computer Sci. Corp.,* 91 F.3d 497, 507 (3d Cir. 1996)). "Employment discrimination cases thus suffer from the difficulty that inheres in all state-of-mind cases—the difficulty of proving discriminatory intent through direct evidence, which is often unavailable." *Zive, supra* (citing *Marzano*, *supra* at 499). "To address the difficulty of proving discriminatory intent, New Jersey has adopted the procedural burden-shifting methodology articulated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973)." *Zive, supra* at 447.

Under the *McDonnell Douglas* framework, the plaintiff must first produce evidence sufficient to establish a *prima facie* case. *See Rogers v. Alternative Res. Corp.,* 440 F. Supp. 2d 366, 369 (D.N.J. 2006). "The evidentiary burden at the prima facie stage is 'rather modest: it is to demonstrate to the court that plaintiff's factual scenario is compatible with discriminatory intent—*i.e.*, that discrimination could be a reason for the employer's action.'" *Zive*, 182 N.J. at 447 (quoting *Marzano*, 91 F.3d at 508). Once the plaintiff has established a *prima facie* case, the burden of production shifts to the employer to articulate a legitimate, non-discriminatory reason for the employer's action. *Id.* at 449. "In the third stage of the burden-shifting scheme, the burden of production shifts back to the employee to prove by a preponderance of the evidence that the

14

reason articulated by the employer was merely a pretext for discrimination and not the true reason for the employment decision." *Id.*

To establish a *prima facie* case of discriminatory discharge, the plaintiff must show by a preponderance of the evidence that the plaintiff (1) belongs to a protected class, (2) was performing in the position from which she was terminated, (3) was discharged, and (4) the employer sought someone else to perform the same work after she left. *Grande v. Saint Clare's Health Sys.*, 230 N.J. 1, 17-18 (2017); *Zive*, 182 N.J. at 471. Here, it is undisputed that Wong was terminated, and neither party claims that the hiring, or not, of a replacement is pertinent to the summary judgment motion. For the purposes of this motion, the defendants also do not contest that Wong is a member of a protected class to the extent that she alleges she had at least a temporary disability and identifies ethnically as a Chinese American. (Mot. 51.) CMMC here focuses on whether Wong has made out a *prima facie* case on the second prong of the analysis: that she was performing in the position from which she was terminated.

The New Jersey Supreme Court has clarified that, with respect to this second prong, the plaintiff need not show that she was performing perfectly at the time she was terminated. *See Zive*, 182 N.J. at 455. Rather, "[a]ll that is necessary is that the plaintiff produce evidence showing that she was actually performing the job prior to the termination." *Id.* at 454. If the plaintiff has a disability, she may satisfy this requirement by putting forth evidence that she was able to perform her job with a reasonable accommodation. *Grande*, 230 N.J. at 21.

It is undisputed that at the time she was fired, Wong was not working. After the conclusion of her week-long medical leave of absence, which was ordered by Dr. Robinton, Wong did not report to any of her scheduled shifts from March 17 through April 25, 2018. (DE 47-28, DE 47-46.) On April 11, Onque sent Wong a warning letter informing her that she was on an unauthorized leave of absence, and on April 24, Onque and Rivera advised

Wong that if she did not report to her shift the following day she would be terminated. (Def. St. ¶97; Pl. Resp. ¶97; DE 47-45.) On April 25, 2018, Wong stated that she was unable to return to work, and on that same date she was fired. (DE 49-5 at 353:21-24.) It is thus clear that Wong was not performing in the position from which she was terminated for over a month prior to her termination.

Given that Wong claims a disability, however, the analysis cannot end there. If Wong can show that, despite some period of disability, she *would* have performed the essential functions of her job if she had been given a reasonable accommodation, a *prima facie* case of discriminatory discharge could still be established. *Sheldon v. Cooper Health Sys.,* No. A-4954-18, 2021 WL 1115986, at *4 (N.J. Super. Ct. App. Div. Mar. 24, 2021). At this stage, the analysis of Wong's discriminatory discharge claim overlaps with the analysis of her NJLAD failure-to-accommodate claim, to which I now turn.

### B. Failure to accommodate under the NJLAD

In Count 2 of the complaint, Wong alleges that the defendants violated the NJLAD by failing to reasonably accommodate her disability. In Count 3, she asserts a related claim that the defendants failed to engage in an interactive process aimed at arriving at such an accommodation.

"To establish a failure-to-accommodate claim under the LAD, a plaintiff must demonstrate that he or she '(1) qualifies as an individual with a disability, or [ ] is perceived as having a disability, as that has been defined by statute'; (2) 'is qualified to perform the essential functions of the job, or was performing those essential functions, either with or without reasonable accommodations'; and (3) that defendant 'failed to reasonably accommodate [his or her] disabilities.'" *Royster v. New Jersey State Police,* 227 N.J. 482, 500 (2017) (quoting *Victor v. State,* 203 N.J. 383, 410 (2010)). "If the employee cannot perform the essential functions of the job because of the disability, 'then the court must consider whether reasonable accommodations would enable the person to perform those functions; however, an accommodation is not

16

reasonable if it imposes undue financial and administrative burdens or requires fundamental changes in the nature of the employment.'" *Sheldon*, 2021 WL 1115986, at *11 (quoting *Svarnas v. AT&T Commc'ns.*, 326 N.J. Super. 59, 75-76 (App. Div. 1999)).

The New Jersey Administrative Code expressly includes "leaves of absence" as a reasonable accommodation, and "[s]ome courts have held that leaves of absence and allowance of time-off for medical care or treatment may constitute reasonable accommodations for disability-related absences." *Svarnas*, 326 N.J. Super. at 79. "Nevertheless, an *indefinite* unpaid leave is not a reasonable accommodation, especially where the employee fails to present evidence of the expected duration of her impairment." *Id.* (citation omitted; emphasis added). "Whether a leave request is reasonable will turn on the facts of each particular case." *Id.*

In her post-discovery certification, Wong denies that she ever requested "indefinite" leave. (Wong Cert. ¶39.) According to Wong, Dr. Vukic's letter merely "evidences the preliminary stage of medical evaluation and an intention to investigate my symptoms." (Wong Cert. ¶40.) Whatever Dr. Vukic's subjective intent may have been, it remains true that the letter did not project any length of time that Wong would be out of work. Instead, Dr. Vukic stated that Wong "is unable to return to work until further notice." (DE 47-37.) Leave "until further notice" is by definition "indefinite" leave; the end date of the requested leave period is unspecified and undefined.[2]

When Dr. Vukic wrote his letter, CMMC had already approved a medical leave of absence for Wong for approximately one week, from March 10 through March 16, 2018. (DE 47-28.) After this approved leave, Wong was again

---

[2]    Wong may be implying that her employer has unfairly seized on an incomplete or tentative evaluation by Dr. Vukic to claim that the requested leave was indefinite. Such a contention would have more force if she had submitted evidence that Dr. Vukic later revised the request or suggested a definite time limit for the requested leave. She did not. Even today, Wong does not state what period was or would have been reasonable.

evaluated at Corporate Care by Dr. Smighelschi, who ordered MRIs of Wong's brain and cervical spine at Wong's request, despite Dr. Robinton's conclusion that such testing was not necessary. (Def. St. ¶¶83-84; Pl. Resp. ¶¶83-84; DE 47-30 at 3.) This evidence suggests that CMMC took Wong's medical complaints seriously and took reasonable steps to ascertain whether, from a medical standpoint, she had recovered and was capable of returning to work.

Moreover, there is every indication that CMMC gave due consideration to the Vukic/Wong request for leave, despite its indefiniteness. Dr. Smighelschi, Dr. Weisberg, and Dr. Robinton had already separately concluded that Wong was able to work without restrictions. Nevertheless, CMMC did not dismiss the Vukic/Wong request for leave outright. Instead, CMMC sent Wong back to Corporate Care for a fifth evaluation. (Def. St. ¶106; Pl. Resp. ¶106.) Following that evaluation, on April 24, 2018, Dr. Weisberg again cleared Wong to return to work without restrictions. (Def. St. ¶107; Pl. Resp. ¶107.)

Wong contends that, during that April 24 evaluation, Dr. Weisberg was dismissive of her symptoms. Her account, if credited, suggests that Weisberg was brusque, impatient, or even rude, but does not undermine his medical conclusions. Weisberg's conclusion that Wong was able to work without restrictions was in line with those of Dr. Robinton, a specialist in neurology, and Dr. Smighelschi. These three doctors based their conclusions on physical examinations, multiple CT scans, an X-Ray, and two MRIs of Wong's head and cervical spine.[3] Considering the extent of medical evaluation that Wong received at Corporate Care and the unanimous conclusion of the three doctors authorized to treat her that she was medically capable of working, it was not unreasonable for CMMC to act on that basis. Particularly given this medical evidence, a rational jury could not plausibly interpret the Vukic/Wong letter as a request for a reasonable accommodation of a disability so that Wong could

_____

[3]      Although she did not believe MRIs were called for, Dr. Smighelschi acceded to Wong's requests and ordered MRIs of her brain and cervical spine. (Def. St. ¶¶83-84; Pl. Resp. ¶¶83-84.) These showed nothing remarkable.

return to work.

Wong's interactive-process claim fails on similar grounds. Pursuant to the NJLAD, "[m]aking a reasonable accommodation for a disabled employee requires an 'interactive process' in which 'both [the] employer and employee bear responsibility for communicating with one another to identify the precise limitations resulting from the disability and potential reasonable accommodation that could overcome those limitations.'" *Sheldon*, 2021 WL 1115986, at *5 (quoting *Jones v. Aluminum Shapes*, Inc., 339 N.J. Super. 412, 422 (App. Div. 2001)). In order to show that an employer failed to participate in the interactive process, the plaintiff must demonstrate that (1) the employer knew of her disability, (2) the plaintiff requested an accommodation or assistance, (3) the employer did not make a good faith effort to assist her in seeking an accommodation, and (4) the plaintiff could have been reasonably accommodated but for the employer's lack of good faith. *Sheldon, supra* (citing *Jones, supra* at 423). All four factors are required, and Wong fails to establish at least three of them.

First, while CMMC conceded and accommodated a temporary period of disability, it did not "know" of any ongoing disability after the initial grant of temporary leave. Indeed, CMMC was on solid ground in believing the contrary, *i.e.,* that Wong had no such disability. Even now, the record before the Court is one-sided: On one side are three medical opinions, supported by repeated consultations and appropriate medical testing; on the other, Dr. Vukic's conclusory note without supporting medical data. Even now, there is no clear statement of what job-related functions Wong is or was unable to perform. The duty to engage in an interactive process is not triggered unless it is established that there is some condition that requires accommodation. *See Bosshard v. Hackensack Univ. Med. Ctr.*, 345 N.J. Super. 78, 91, 783 A.2d 731, 739 (App. Div. 2001) ("Summary judgment was properly granted in this case because the overwhelming evidence was that despite plaintiff's hearing impairment and desire for a special stethoscope, the defendants were completely satisfied that

19

the impairment did not affect her ability to perform her job.") Once Wong had been cleared for work without restrictions, interactive discussions about whether there were reasonable alternatives to indefinite leave became moot.

Second, as discussed above, Wong's request for indefinite leave might—barely—be seen as opening the door to a request for an accommodation, although indefinite leave cannot be seen as a "reasonable" accommodation. The record does not reveal any other proposed accommodation; the most obvious alternative, temporary leave, was not advanced by Wong. *See* p. 17 n.2, *supra*. In any event, the employer had found, with good support, that there was no ongoing disability.

Third, the record shows that CMMC responded in good faith to the Vukic/Wong request by instructing that she again return to Corporate Care for evaluation, despite the well supported opinions of multiple doctors that she was medically able to work. In that context, a generalized allegation that Dr. Weisberg took a "dismissive" attitude on April 24th is not sufficient to permit a rational jury to find that CMMC did not make a good faith effort to analyze Wong's condition or respond to her request for an accommodation.

And fourth, as noted, Wong herself does not proffer any good reason to believe that any alternative to indefinite leave, such as temporary leave, would have sufficed. She denies that Vukic's letter was a request for indefinite leave, but she testified three years later, in July 2021, that she was still unable to return to work as a nurse.

The claims related to failure-to-accommodate, asserted in Counts 2 and 3, must therefore be rejected. Turning back to Wong's claims related to discriminatory discharge, asserted in Counts 1 and 4, I find for similar reasons that she has failed to show that she was able to perform her job or was prevented from doing so by lack of a reasonable accommodation.

I therefore grant summary judgment to the defendants on Wong's claims of discriminatory discharge, Counts 1 and 4, and of failure to accommodate and engage in the interactive process, Counts 2 and 3.

### C. NJLAD retaliation

In Counts 4 and 5 of the complaint, Wong alleges that she was retaliated against for complaining about race discrimination and for requesting a reasonable accommodation. The NJLAD makes it unlawful "[f]or any person to take reprisals against any person because that person has opposed any practices or acts forbidden under" the NJLAD. N.J. Stat. Ann. § 10:5-12(d).

The *McDonnell Douglas* framework applies to claims for retaliation under the NJLAD. That is, the plaintiff must present a prima facie case; the employer may respond by demonstrating a reasonable, nondiscriminatory basis for the termination; and the plaintiff may then attempt to rebut that basis as a mere pretext. *See* Part IV.A, *supra*.

#### 1. *McDonnell Douglas step one: Prima facie case*

To establish a *prima facie* case, Wong must demonstrate: "(1) that she engaged in protected activity; (2) the activity was known to the employer; (3) [Wong] suffered an adverse employment decision; and (4) there existed a causal link between the protected activity and the adverse employment action. *Young v. Hobart W. Grp.*, 385 N.J. Super. 448, 465, (App. Div. 2005) (citing *Craig v. Suburban Cablevision*, 140 N.J. 623, 629–30 (1995)). "Pursuant to N.J.S.A. 10:5–12d, a person engages in protected activity under the LAD when that person opposes any practice rendered unlawful under the LAD." *Young, supra* at 466.

Defendants do not dispute that a complaint about race discrimination or a request for accommodation would constitute protected activity under the NJLAD. (Mot. 18, 20.) Defendants argue, however, that no causal link exists between either of these protected activities and Wong's termination. "Cases in which the required causal link has been at issue have often focused on the temporal proximity between the employee's protected activity and the adverse employment action, because this is an obvious method by which a plaintiff can proffer circumstantial evidence 'sufficient to raise the inference that her protected activity was the likely reason for the adverse action.'" *Kachmar v.*

*SunGard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir. 1997) (quoting *Zanders v. National R.R. Passenger Corp.*, 898 F.2d 1127, 1135 (6th Cir. 1990)). "[W]here there is a lack of temporal proximity, circumstantial evidence of a 'pattern of antagonism' following the protected conduct can also give rise to the inference." *Kachmar, supra* (quoting *Robinson v. Southeastern Pa. Transp. Auth.*, 982 F.2d 892, 895 (3d Cir. 1993)).

I focus initially on Wong's claim of retaliation for her complaints about racist comments. Wong argues that the record reveals a pattern of antagonism by defendants following her complaints. (Opp. 8-10.) Wong testified that in July 2016, she complained to her then-supervisor, Rose Giachetti, about nurse Inu's allegedly racist comments. (Wong Dep. 616:14-617:17.) Seven months later, in February 2017, Wong received a disciplinary writeup, the first one she had ever received in her fourteen years of employment as an RN at CMMC. (Wong Dep. 74:2-19.) This consisted, however, of no more than a "verbal warning" for failing to ensure that a patient was seen by a primary doctor. (*Id.* 74:20-76:23.)

In her post-discovery certification, Wong stated for the first time that she had also complained about race discrimination to Heather Reginio, another supervisor, in December 2017. (Wong Cert. ¶27.) Two months later, in February 2018, Wong received her second-ever disciplinary writeup. According to the disciplinary notice, Wong failed to infuse IV fluids for over 1 hour and failed to take vital signs every 15 minutes during a "Code Green," which indicates sepsis. She also failed to notify her nurse manager of the Code Green. (Def. St. ¶39; Pl. Resp. ¶39; DE 54-3 at 45.)[4]

---

[4]     In addition to these disciplinary writeups, Wong was suspended from her position in March 2017 because her ACLS certification had lapsed. (Def. St. ¶36; Pl. Resp. ¶36.) The record reveals that Heather Reginio was the person who wrote up Wong's disciplinary form in this instance. (DE 54-3 at 43.) There is no evidence that this disciplinary action was retaliatory, however, because Wong claims that she did not complain to Reginio about race discrimination until December 2017—nine months later. Wong was reinstated to her position once she took the required course to maintain her ACLS certification. (Wong Dep. 69:19-21.)

There is no evidence in the record that the disciplinary writeups Wong received were invalid or based on false information, undercutting any inference that they were retaliatory. Of course, it is possible that even if valid, they were motivated by a desire to retaliate against Wong for complaining about race discrimination. But this conclusion is not particularly plausible. Receiving a deserved verbal warning on a valid basis would not tend to intimidate a reasonable employee from complaining about racism. And in any event a mere verbal warning would not rise to the level of retaliation. *Thomas v. Indep. Twp.*, 463 F.3d 285, 296 (3d Cir. 2006) (retaliatory action must be "sufficient to deter a person of ordinary firmness from exercising his constitutional rights"); *Starnes v. Butler Cnty. Ct. of Common Pleas*, 971 F.3d 416, 429 (3d Cir. 2020) (same); *Joyce v. City of Sea Isle City*, No. CIV. 04-5345RBK, 2008 WL 906266, at *19 (D.N.J. Mar. 31, 2008) ("ordinary firmness" standard applies to NJLAD retaliation claim). With particular reference to Wong's complaint to Giachetti, the alleged retaliation did not occur until seven months after the event. That lapse in time between the complaint and the alleged retaliation, absent further evidence, undercuts any inference that the two were causally connected.

In her post-discovery certification, however, Wong also recalled that she complained to Onque (with Rivera potentially present) about Dr. Weisberg's allegedly racist comments. She made that complaint on April 24, 2018, the day before she was terminated. (Wong Cert. ¶¶28, 34.)[5]

Before discussing the substance, I deal with the defendants' threshold

---

[5]     Wong also states that she reported her concerns about race discrimination to Kim Byrne, Director of Critical Care; Ronnie Castro, Director of Cardiac Services and Primary Stroke Program; Dr. Mazzarella, Chief Medical Officer; and Sally Zuza in HR. But there is no evidence that these individuals ever disciplined Wong, nor is there any evidence that Byrne, Mazzarella, or Castro were involved in the decision to terminate Wong. As for Zuza, Wong allegedly complained to her about nurse Inu's comments, which were made while Wong's father was in the hospital in July 2016. (Wong Cert. ¶48.) While the record does not indicate when Wong complained to Zuza, the implication is that she did so around that time, which was nearly two years before she was terminated.

argument that Wong's belated certification constitutes a "sham affidavit" and should therefore be disregarded. (Reply 1.) They point out that Wong was extensively questioned during her deposition about any reports she made of discrimination. Despite this extensive testimony, it was not until her certification in opposition to summary judgment that Wong recalled having complained to Onque.

Under the sham affidavit doctrine, "'a party may not create a material issue of fact to defeat summary judgment by filing an affidavit disputing his or her own sworn testimony without demonstrating a plausible explanation for the conflict.'" *Jiminez v. All American Rathskeller, Inc.*, 503 F.3d 247, 251 (2007) (quoting *Baer v. Chase*, 392 F.3d 609, 624 (3d Cir. 2004)). Underlying the doctrine is the recognition that the "'deposition of a witness will usually be more reliable than his affidavit.'" *Jimenez, supra* (quoting *Perma Research & Development Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969)). Depositions are adversarial in nature and provide the opportunity for cross-examination. Affidavits, on the other hand, are typically drafted by counsel and often consist of "'efforts to patch up a party's deposition with his own subsequent affidavit.'" *Jimenez, supra* (quoting *Russell v. Acme-Evans Co.*, 51 F.3d 64, 67-68 (7th Cir. 1995)).

"To be covered by the sham affidavit doctrine, the affidavit testimony must actually *contradict* previous deposition testimony, not merely differ from it or be in tension with it." *Ramirez v. Lora*, No. CV1811230KMMAH, 2022 WL 1539176, at *8 (D.N.J. May 16, 2022) (citing *SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 210 (3d Cir. 2022) ("the sham affidavit rule permits striking only contradictory statements in later-provided affidavits or declarations")). In this instance, while Wong's certification certainly differs from her deposition testimony, the two are not directly contradictory. Wong did not testify, for instance, that she never reported her concerns about discrimination to Onque and Rivera.

It would have been natural for Wong to mention these reports during her

deposition. Her failure to do so may arouse suspicion and provide fodder for cross-examination. Exclusion of the affidavit, however, is strong medicine, usually reserved for cases of unexplained outright contradiction.

The close temporal proximity between the complaint and Wong's termination one day later, unless explained, could support an inference of causality. With the certification as part of the record, I will assume that Wong is able to establish a *prima facie* case of wrongful termination in retaliation for having complained about Dr. Weisberg's alleged racist comments the day before.

### 2. *McDonnell Douglas* step two: Employer's nondiscriminatory basis for termination

In response to this *prima facie* case, the defendants have offered a legitimate, non-retaliatory reason for Wong's termination: her unexcused absence after she had repeatedly been medically cleared to work.

As Wong presents the facts, she complained about Dr. Weisberg's racial comments on April 24 and was dismissed in retaliation for that complaint on the following day, April 25. The undisputed facts, however, demonstrate that her account, even if wholly credited, is misleadingly incomplete. (The facts are related in more detail at pp. 3–8, *supra*.)

 On March 9, 2018, Dr. Robinton found Wong's complaints of symptoms to be disproportionate to the injuries, but authorized one week's leave until March 16. Dr. Smighelschi confirmed that return date and ordered MRIs of the brain and cervical spine, but found nothing of particular concern. Wong nevertheless did not report for work on March 17 or thereafter. On March 20, she was examined by Dr. Weisberg, who agreed with Dr. Robinton and Dr. Smigelschi that Wong was fit to return to work full duty.

Again, Wong did not report to work at all. On April 11, Onque advised her by letter that she had been on unapproved leave since March 17, that it was assumed she had separated from her position, and that if the employer did not hear from her by April 18, she would be terminated. It was shortly thereafter that she presented the Vukic note, requesting leave for an indefinite

25

period of time.

That is the background for yet another medical reevaluation on April 24 by Dr. Weisberg, who again cleared Wong to return to work, and her meeting with Onque the same day, in which she was told that if she did not return to work the following day, April 25, she would be terminated. She did not report for work on April 25, and was dismissed.

I find that CMMC presented ample evidence of a non-discriminatory basis for the termination: specifically, that Wong had refused to return to work despite being repeatedly medically cleared to do so.[6]

### 3. *McDonnell Douglas* step three: Employee's showing of pretext

The burden then shifts to Wong to show that the proffered basis for her termination (absence without leave) was a pretext for the actual reason (retaliation for complaining about racial comments by Dr. Weisberg on April 24). *See Young*, 385 N.J. Super. at 465 (explaining that once plaintiff establishes a *prima facie* case of retaliation, the burden shifts to defendants to articulate a legitimate reason for the decision, after which the plaintiff must demonstrate that the legitimate reason was merely a pretext for the underlying

---

[6]    There was nevertheless yet another follow up visit to Dr. Robinton on May 1, 2018. Def. St. ¶¶110-11; Pl. Resp. ¶¶110-11.) Dr. Robinton, who is not alleged to have made any racial comments, found as follows:

> On examination today [Wong] scored 38/38 on a formal mental status exam. Cranial nerve testing revealed no abnormalities. On motor testing, there was normal bulk and tone. Power was 5 out of 5. Sensory exam was intact. Cerebellar testing was normal. Galt testing revealed narrow base with equal armswing. Reflexes were symmetric. Toes were downgoing.

(Def. St. ¶113; Pl. Resp. ¶113.) Dr. Robinton concluded as follows:

> Based on today's examination and the nature of the injury, I continue to believe that from a neurologic perspective, she has reached maximum medical improvement and is able to work full duties in her usual occupation without restriction. Neurologic follow up is not required.

(Def. St. ¶112; Pl. Resp. ¶112.)

26

retaliatory motive).

A plaintiff may show pretext and defeat a summary judgment motion "by either (i) discrediting the proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). The plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Id.* (Quotations omitted.)

Wong's evidence of pretext does not come close to rebutting the evidence that CMMC had a legitimate basis for termination. I do not repeat the evidence, cited above, that CMMC's analysis of the medical facts was conscientious and well supported by exhaustive medical consultations and objective medical evidence. Wong offers little in response beyond a bare, conclusory diagnosis in Dr. Vukic's letter, which neither cited supporting medical evidence nor prescribed any course of treatment beyond cognitive testing. Wong argues, however, that pretext is apparent from the fact that the doctors at Corporate Care disregarded Dr. Vukic's letter stating that Wong was unable to work, despite the letter's invitation to contact Vukic if they had "any questions or concerns." (Opp. at 11; DE 47-37.) According to Wong, this evidences the defendants' desire to manufacture an alternative reason to terminate Wong.

The record shows that Onque sent Dr. Vukic's note to Chief Human Resources Officer Alfred Torres, who forwarded it to Caryl Russo, the head of Corporate Care.[7] (DE 47-39.) To properly analyze the significance of Corporate Care's failure to contact Dr. Vukic, it helps review the roles of Corporate Care

---

[7]     Wong also states in her opposition brief that Human Resources failed to send Dr. Vukic's letter to Corporate Care, but both the record and Wong's own responsive statement of material facts belie this assertion. (Def. St. ¶101; Pl. Resp. ¶101.).

and HR in dealing with an employee who has a workers'-compensation-covered injury.

Chief HR Officer Torres testified that "HR doesn't clear an employee from a medical injury"; rather, the physicians at Corporate Care are solely responsible for determining whether an employee is medically capable of working. (DE 49-6 at 38:1-8.) If Corporate Care clears an employee to return to work, it is generally mandatory for that employee to return. (*Id.* at 38:9-11.) If that employee nevertheless does not return, the employee will be terminated by HR. (*Id.* at 38:13-15.)

Torres also testified that the actual decision to terminate an employee is made by him in consultation with his team in HR and "[n]obody else." (DE 49-6 at 44:24-45:13.) In the case of Wong's termination, Torres testified without contradiction that he made the decision with Onque and Rivera. (*Id.* 45:14-25.) In short, then, the doctors at Corporate Care evaluate the employee's medical condition and ability to work, and HR makes the resulting personnel decisions, *e.g.,* whether to terminate.

The following excerpt from Torres's deposition suggests that Corporate Care (as opposed to HR) had a practice of considering the opinion of the employee's personal physician in evaluating the employee's fitness to work:

> Q: Now, what would happen in a situation where Corporate Care states the employee is cleared to return to work, but the employee's own treating physician disagrees and states that employee is not cleared to return to work?
>
> A: Since HR doesn't do any clinical evaluations, we would send it back to the Corporate Care leadership team to follow up with their normal procedures of following up with the employee's physician and whatever other experts are working with them.
>
> Q: So you would have Corporate Care then interact with the employee's treating doctor and then Corporate Care after consulting with the treating doctor would make a final determination whether this employee could return to work or not, correct?
>
> A: That is correct.

Q: And then it would be based on Corporate Care's final determination after consulting with that employee's personal doctor that would then govern whether or not, number one, you would mandate that employee to return to work, number two, if that employee didn't return to work, then terminate the employee, correct?

A: Yes. Corporate Care would have the final determination after they completed the medical evaluation whether the employee was cleared to return to work or not.

(DE 49-6 at 38:16-39:25.)

Now a rational jury hearing Torres's testimony could conclude that the Corporate Care doctors might have been well advised to contact Dr. Vukic in order to explore the basis for his opinion. Nevertheless, their failure to do so is not a sufficient basis for a jury to find that HR's stated basis for terminating Wong was pretextual. As noted, the supporting medical evidence was very substantial. Even now, Wong asserts no more than a sterile claim of failure-to-consult; she does not offer actual medical evidence that would reasonably have refuted, or even swayed, the opinions of the Corporate Care doctors. And Torres's testimony reveals that where an employee is medically cleared to return to work but does not do so, the decision to terminate the employee for job abandonment is virtually automatic. (DE 49-6 at 46:13-47:2.) That the medical evidence could have been more complete does not undermine the conclusion that the basis for HR's decision was substantial and not pretextual.

Wong's claim that she was retaliated against for requesting an accommodation fails for the same reason. As noted above, a request for indefinite leave is not a request for a reasonable accommodation. And even if Wong could make out a *prima facie* case of retaliation for requesting leave, the record would not support a conclusion that the defendants' termination of Wong based on her continued absence was pretextual. Denial of a request for accommodation is not "retaliation" for making the request, provided the denial was for a legitimate reason.

I will therefore grant summary judgment to the defendants on the NJLAD

retaliation claims asserted in Counts 4 and 5.

### D. Workers' compensation retaliation

In a similar vein to the NJLAD, the New Jersey workers' compensation statute prohibits an employer from discharging an employee because that employee filed a workers' compensation claim. N.J. Stat. Ann. § 34:15-39.1. To make out a *prima facie* case of retaliatory discharge under the statute, Wong must prove: (1) that she made or attempted to make a claim for workers' compensation; and (2) that she was discharged in retaliation for making that claim. *Cerracchio v. Alden Leeds, Inc.*, 223 N.J. Super. 435, 442–43 (App. Div. 1988).

The day after she was injured, Wong filled out an incident report notifying CMMC of her workplace injury. (Def. St. ¶¶41-42; Pl. Resp. ¶¶41-42.) CMMC thereafter notified its workers' compensation insurance carrier of the incident. Although Wong did not file a formal petition for workers' compensation benefits until after she was terminated, her earlier action "set into motion the filing of a workers' compensation claim." *Cerracchio*, 223 N.J. at 443. Her action thus constitutes an attempt to make a claim for benefits within the meaning of the workers' compensation statute. *Id.*

Nonetheless, there is insufficient evidence from which a jury could conclude that Wong was discharged in *retaliation* for exercising her rights under the workers' compensation statute. Wong initiated her claim on February 19, 2018, but was not terminated until April 25. Between those two dates, Wong was repeatedly cleared to return to work, encouraged to do so, and warned that her continued absence would result in termination. There is no evidence that the defendants even contemplated terminating her until April 5, 2018, when Rivera directed Onque to send Wong a letter regarding her unauthorized leave of absence. (Pl. St. ¶49; Def. Resp. ¶49.) At that point, she had missed ten scheduled shifts in a row. (DE 47-28 at 2.)

Wong argues that the defendants' retaliatory animus can be gleaned from the fact that the Corporate Care doctors (Weisberg in particular) were

dismissive of her symptoms. (Opp. 17-18.) As discussed above, there is no evidence that any of the Corporate Care doctors participated in the decision to terminate Wong. Thus, even assuming the truth of Wong's contention that a doctor or doctors took a dismissive attitude, that would not be sufficient to demonstrate that Wong was terminated for setting in motion, if not actually filing, a workers' compensation claim. I will therefore grant summary judgment to the defendants on Wong's workers' compensation retaliation claim, asserted in Count 6.[8]

### E. FMLA interference

The FMLA entitles employees to take job-protected leave for medical reasons or to care for family members with serious health conditions. 29 U.S.C. § 2601(b). Pursuant to the FMLA, an eligible employee is entitled to a total of 12 workweeks of unpaid leave during any 12-month period. 29 U.S.C. § 2612(a)(1), (c). On return from such leave, the employee is entitled "to be restored by the employer to the position of employment held when the leave commenced," or "to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." 29 U.S.C. § 2614(a)(1). It is unlawful "for any employer to interfere with, restrain, or deny the exercise of or attempt to exercise" any rights provided under the statute. 29 U.S.C. § 2615(a)(1).

---

[8]     Wong also points to a letter she received from Kelly Yeager, a claims representative for PMA Companies, CMMC's workers' compensation carrier. That letter, dated March 29, 2018, states that MRIs were ordered per Wong's request and that Dr. Weisberg reviewed the findings with Wong and discharged her on March 20, 2018. (DE 54-4 at 26.) As a result, the letter states that no further treatment was authorized on Wong's claim at the time. It concludes by directing Wong to contact her attorney with any questions or concerns.

Wong argues that Yeager's directive to contact a lawyer was inappropriate and evidences the defendants' retaliatory animus towards Wong. (Opp. 18.) It is far from clear that the letter was inappropriate by any means, but more importantly, Yeager is not an employee of CMMC or RWJBH, and there is no evidence that Yeager played any role in Wong's termination. Accordingly, Yeager's letter does not support Wong's workers' compensation retaliation claim.

Count 7 of the complaint asserts that the defendants unlawfully interfered with the protections afforded to Wong under the FMLA. To prevail on an FMLA interference claim, a plaintiff must show that she was entitled to benefits under the FMLA and that her employer denied them. *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.,* 691 F.3d 294, 312 (3d Cir. 2012).

Wong claims that the defendants interfered with her FMLA rights by inaccurately stating that she was ineligible for FMLA leave following her February 2018 injury. In addition to speaking with Onque and Rivera about her desire to take FMLA leave, Wong spoke to Sally Zuza in HR. Zuza told her that the hospital has a policy that prohibits employees from taking more than 12 weeks of FMLA leave in any two-year period. (Zuza Dep. 39:6-40:21.) Zuza stated that, because Wong had already taken leave to care for her mother between February and May 2016, she was ineligible for job-protected leave after her February 2018 injury. (Wong Dep. 72:10-21.)

Wong notes that under the New Jersey Family Leave Act ("NJFLA"), an employee is only entitled to 12 weeks of leave during a 24-month period, but under the FMLA, an employee may take up to 12 weeks per year. According to Wong, the defendants misled her in advising her of rights under the NJFLA rather than the FMLA. (Opp. 25-26.)

It is important to keep in mind that leave, whether under the FMLA or the NJFLA, is unpaid leave. The defendants argue that Wong's claim fails because she cannot show that she suffered any harm from being misled. The defendants point out that, according to her own testimony, Wong has not sought to return and is still unable to work as an RN. (DE 49-5 at 353:21-24.) Dr. Vukic also concluded that Wong was unable to return to work when he last examined her in August 2019. (Def. St. ¶¶156-57; Pl. Resp. ¶¶156-57.) According to the defendants, because Wong would not have returned to her position following exhaustion of 12 weeks of FMLA leave, she was not harmed by any alleged interference with her FMLA rights. (Mot. 32-33.)

Here, we are in a looking-glass war, in which each side may accuse the other of inconsistency. Defendants, after all, maintain that they terminated

Wong for refusing to work when she was medically cleared to do so. For FMLA purposes, however, they assume *arguendo* Wong's position that she would *not* have been able to return to work, even at the conclusion of 12 weeks of leave.

I will return to the inconsistency issue in a moment. For now, I observe that the views of Wong and Dr. Vukic regarding Wong's ability to work were assuredly at odds with the views of the Corporate Care physicians. The record demonstrates conclusively, however, that in deciding whether to report to work, Wong was guided by the former and not the latter. In the context of this FMLA issue, we must consider whether there is any evidence that Wong *would* have resumed her duties, or felt herself able to do so, after the hypothetical 12 weeks of FMLA leave had expired (presumably around June 2018). It is clear that she would not; her doctor, Vukic, said so in August 2019, and even three years after the event, in July 2021, she testified that she was still unable to work as a nurse.

"The failure to restore an employee to her position at the conclusion of her leave does not violate the FMLA if the employee remains unable to perform an 'essential function' of the position." *Budhun v. Reading Hosp. & Med. Ctr.*, 765 F.3d 245, 254 (3d Cir. 2014) (citing 29 C.F.R. § 825.216(c)). In addition, "[t]he FMLA does not require an employer to provide a reasonable accommodation to an employee to facilitate his return to the same or equivalent position at the conclusion of his medical leave." *Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375, 384 (3d Cir. 2002). Consequently, had the defendants permitted Wong to take FMLA leave and then terminated her at the conclusion of such leave because she declared herself still unable to work, Wong would have no claim for FMLA interference.

The issue here, however, is whether the defendants violated the FMLA by interfering with Wong's ability to take leave in the first instance. If the defendants had refused Wong's request to take FMLA leave but did not terminate her, she could endeavor to show that she was harmed by having to work when she was medically incapable of doing so. Less clear is whether

33

Wong can show that she was harmed by defendants' interference with her right to take leave where she was terminated—and thus did not work while medically incapable of doing so—and further where, by her own account, she would have remained incapable of returning to her position at the conclusion of the 12-week period.

"[T]he FMLA does not provide leave for leave's sake, but instead provides leave with an expectation an employee will return to work after the leave ends." *Throneberry v. McGehee Desha Cnty. Hosp.*, 403 F.3d 972, 978 (8th Cir. 2005). Unpaid leave is not a benefit as such; the gist of the benefit is the right to take such leave with the assurance that one's job is protected upon her return. Here, then, Wong has no claim that she was harmed merely by being denied the right to take FMLA leave. Instead, her claim must be that she was harmed by being denied the right to take FMLA leave and subsequently return to her job. Given that Wong herself claims that she could not have returned to her RN position after the statutory leave period had expired, it is difficult to see how Wong was harmed by the defendants' interference with her FMLA rights.

I return to the inconsistency issue. Does it matter that, at the time Wong was terminated, the defendants did not believe her claim that she was medically unable to return to work? Although I am not aware of any controlling authority on point, persuasive authority leads me to conclude that it does not matter.

*Edgar v. JAC Prod., Inc.*, 443 F.3d 501 (6th Cir. 2006), is not precisely on point, but its approach is suggestive. There, the plaintiff was terminated from her position after she was absent from work for several weeks because of a medical condition. *Id.* 503-05. Although the plaintiff had requested FMLA leave, her leave of absence was considered unauthorized because she failed to timely submit the required medical documentation. *Id.* Several days after her termination, in October 2002, the plaintiff's doctor evaluated her and initially projected her return to work after three months, but ultimately did not clear her to work at full capacity until some 15 months after the expiration of the 12-

34

week FMLA leave period. *Id.*

The Sixth Circuit held that the plaintiff had no claim for FMLA interference on these facts. *Id.* at 514. The Court explained that whether an employee is denied an FMLA benefit to which she is entitled is an objective inquiry. *Id.* at 511. In contrast to a retaliation claim, the employer's motives are not at issue in an interference claim. Thus it is irrelevant whether the employer knew at the time of termination that the employee could not return to work by the end of the 12-week period; the fact, as it turned out, is that she could or would not. *Id.*[9] The Court reasoned that the FMLA "is concerned not with how a serious physical or medical ailment occurred, but with whether that ailment precluded the employee from performing an essential function of his or her job at the end of the leave period." *Id.* at 516. Indeed, it does not even matter whether the condition that prevents the employee from returning to work "is the same one that forced the employee to take a medical leave in the first place." *Id.* What matters is the bare fact that the employee was not returning at the end of the leave period.

I am persuaded by the Sixth Circuit's straightforward approach in *Edgar*. By her own account, Wong was not at work, and was not being paid, for 12 weeks (and long thereafter), just as she would have been if leave had been granted. By her own account, Wong was unavailable to work, for whatever reason, at the conclusion of the 12-week leave period. The FMLA guarantee that her job would be waiting is thus irrelevant; there is no evidence in the record that she would have returned to her position at that time. Accordingly, I conclude that Wong possesses no claim for FMLA interference. Summary judgment is granted to the defendants on Count 7.

### F. Common law claims

Counts 8 and 9 of the complaint assert claims under New Jersey

---

[9]    For similar reasons, the Sixth Circuit also rejected an argument that Wong advances here: that the termination "exacerbated" plaintiff's condition and thus prevented her from being able to return to work following the statutory leave period. *Id.* at 517.

common law for breach of contract and breach of the implied covenant of good faith and fair dealing. Wong cannot succeed on these claims because there is no contract between herself and CMMC.

It is undisputed that there is no employment agreement as such. The parties dispute, however, whether the CMMC employee handbook created a binding contract. The New Jersey Supreme Court has held that "*absent a clear and prominent disclaimer*, an implied promise contained in an employment manual . . . may be enforceable against an employer. *See Woolley v. Hoffmann-La Roche, Inc.*, 99 N.J. 284, 285–86 (1985) (emphasis added). A disclaimer is effective if it is sufficiently prominent to attract the reader's attention and if it is "expressed in clear, straightforward terms, and not 'confusing legalese.'" *Zawadowicz v. CVS. Corp.*, 99 F. Supp. 2d 518, 535 (D.N.J. 2000) (quoting *Nicosia v. Wakefern Food Corp.,* 136 N.J. 401, 560 (1994)). "[W]hen the facts surrounding the content and placement of a disclaimer are themselves clear and uncontroverted . . . the effectiveness of a disclaimer can be resolved by the court as a question of law." *Nicosia, supra* at 416.

A contract is created by mutual assent. CMMC's employee handbook contains a section on "The Employment Relationship," which expressly disclaims contractual status:

> *The information in this Handbook is intended to serve only as a guide or summary digest of Barnabas Health policies, rules, regulations, benefit plans, and programs. Nothing contained in this Handbook or in any policy, rule or regulation of the Company shall constitute a contract of employment, nor constitute an inducement for employment. No promise of any kind by the Company is made in this Handbook.*

(DE 61-13 (italics in original).)

On December 31, 2003, Wong signed a paper titled, "Receipt of Employee Handbook," which contains two paragraphs of text. (DE 47-48.) In addition to explaining that Wong is an at-will employee, the text provides:

> I understand that the Employee Handbook which I have received constitutes management guidelines only and is not to be

> interpreted as a contract between me and Clara Maass Medical Center. Moreover, Clara Maass Medical Center reserves the right to modify or delete any of its policies without notice, at any time, whether or not in existence at the time of my initial employment.
>
> I understand that neither this Handbook nor any other communications by a management representative, manual, policy, practice or procedure is intended to create a contract of employment, express or implied.

(*Id.*)

I conclude that the section of the CMMC employee handbook cited above, in conjunction with the signed receipt of handbook form, clearly and effectively disclaimed any contractual rights arising from the handbook. Wong therefore has no claim for breach of contract based on the employee handbook. Nor does she have any claim for breach of the implied duty of good faith and fair dealing, which is dependent on the existence of a contract. *See Nolan v. Control Data Corp.,* 243 N.J. Super. 420, 429 (App. Div. 1990) ("In the absence of a contract, there is no implied covenant of good faith and fair dealing.").

Summary judgment is therefore granted to the defendants on Counts 8 and 9 of the complaint.

## V.      Conclusion

For the reasons set forth above, the defendants' motion for summary judgment is **GRANTED** in its entirety and all claims asserted by Wong in this action are dismissed. Given this outcome, I need not address the arguments raised in points seven, eight, and nine of the defendants' moving brief, which seek dismissal of Wong's claims against RWJBH on the ground that she was not employed by that defendant, as well as dismissal of her claims for lost wages and punitive damages. An appropriate order accompanies this opinion.

Dated: September 7, 2023

/s/ Kevin McNulty

_____

Kevin McNulty
United States District Judge